IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ROBERT W. MAUTHE, M.D., P.C., a Pennsylvania corporation, individually and as the representative of a class of similarly-situated persons, | : : : : : | |
| Plaintiff, | : : | CIVIL ACTION NO. 18-1901 |
| v. | : : | |
| MCMC LLC, | : : | |
| Defendant. | : | |

## MEMORANDUM OPINION

Smith, J.                                                                                       May 13, 2019

The plaintiff, a doctor and his medical practice of the same name, brought this class action lawsuit under the Telephone Consumer Protection Act, as amended by the Junk Fax Act ("TCPA"), after receiving a fax from the defendant advertising a continuing medical education course. Although the plaintiff did not recall at the time he filed suit, the parties had a preexisting agreement dating back to 2011, through which the defendant referred patients to the plaintiff for independent medical evaluations. Generally, an agreement of this sort constitutes an established business relationship ("EBR") that exempts fax senders or broadcasters from TCPA liability, but the parties agree that the EBR exemption is unavailable here because the fax did not include the necessary opt-out notice. Nonetheless, the defendant now moves for summary judgment, arguing that this action fails because the fax was not "unsolicited" within the meaning of the TCPA, as the subject matter being advertised directly related to the parties' agreement and, specifically, its requirement that the plaintiff maintain the relevant medical certifications. Thus, the heart of the dispute is whether, through the parties' existing relationship, the plaintiff provided express

permission to warrant the fax "solicited." The court agrees with the defendant that the plaintiff consented to receive certain faxes in the course of the parties' relationship. However, the court cannot conclude, based on the current record, that the connection between the agreement's certification requirements and the seminar being advertised is sufficiently close to establish express consent existed as a matter of law. Instead, a genuine issue of material fact exists as to the scope of the granted consent.

The defendant also claims that it is entitled to summary judgment on all the plaintiff's claims because (1) the plaintiff lacks both Article III and prudential standing and (2) applying the TCPA to the offending fax would violate the defendant's First Amendment rights. As to the plaintiff's claim for treble damages, the defendant argues that summary judgment is appropriate because there is no evidence that the defendant willfully or knowingly violated the TCPA. The defendant further argues that, after granting judgment in its favor on the plaintiff's federal causes of action, the court should decline to exercise supplemental jurisdiction over the plaintiff's conversion claim.

The court rejects the argument that the plaintiff lacks Article III standing because his alleged injury—lost use of a fax machine, paper, and toner and intrusion into his day—would have occurred even if the fax included a compliant opt-out notice. To the contrary, Congress required advertisers to include valid opt-out notices on unsolicited faxes to parties with whom they have an EBR precisely because it recognized that a cost-free mechanism to avoid future communications mitigated the risk of unwanted intrusion. As to the defendant's argument that the plaintiff lacks prudential standing, the fact that he has brought other TCPA lawsuits does not render him a "professional plaintiff" outside the zone of interests the statute is meant to protect.

The defendant also argues that the TCPA, as applied to the plaintiff, violates its First Amendment right to free speech, because the plaintiff's deposition testimony that he did not consider the fax to have violated his privacy means he did not suffer the injury Congress meant to address by requiring opt-out notices on unsolicited faxes sent in the context of an EBR. However, the plaintiff's other testimony establishes that he did, in fact, suffer what constitutes a legal invasion of privacy as Congress understood it, even if he himself, as a non-lawyer, would not use that terminology.

Lastly, the court holds that the defendant's claim that its representatives did not know about the TCPA, although undisputed, does not mean that the alleged violation cannot have been willful or knowing so as to create the possibility treble damages. To the contrary, treble damages could be appropriate if the defendant sent a fax advertisement it knew was unsolicited, even if it did not realize that doing so amounted to a statutory violation.

Accordingly, the court denies the defendant's motion for summary judgment.

## I.  PROCEDURAL HISTORY

The plaintiff, Robert W. Mauthe, M.D., P.C. ("Dr. Mauthe"),[1] initiated this action by filing a class action complaint against the defendant, MCMC LLC ("MCMC"), on May 7, 2018. Doc. No. 1. Dr. Mauthe also filed a motion for class certification the same day. Doc. No. 2. On May 16, 2018, the court denied the motion for class certification without prejudice, noting that the plaintiff had not yet served the defendant with the complaint and the parties had not yet engaged in any class action discovery. *See* Order at 1, Doc. No. 3. MCMC moved to dismiss out-of-state putative class members for lack of personal jurisdiction on July 2, 2018. Doc. No. 12. Dr. Mauthe filed a response in opposition on July 16, 2018, Doc. No. 15, and MCMC filed a reply in further support

---

[1] For ease of reference, the court will use "Dr. Mauthe" to refer to both the medical practice and the doctor who runs that practice.

of the motion on July 23, 2018. Doc. No. 17. The court denied the motion without prejudice as premature on August 3, 2018. Doc. No. 18. MCMC then answered the complaint on August 16, 2018. Doc. No. 21.

After conducting limited discovery,[2] MCMC filed the instant motion for summary judgment on January 7, 2019, Doc. No. 34, to which Dr. Mauthe filed a response in opposition on February 4, 2019. Doc. No. 44. MCMC then filed a reply in further support of the motion on February 25, 2019, Doc. No. 46, and a notice of supplemental authority regarding the Fourth Circuit's recent decision in *American Association of Political Consultants, Inc. v. FCC*, No. 18-1588, 2019 WL 1780961 (Apr. 24, 2019) ("*American Association*") on May 6, 2019. Doc. No. 49. The motion for summary judgment is now ripe for adjudication.

## II.     FACTUAL BACKGROUND

Dr. Mauthe is a private medical practice in Central Valley, Pennsylvania run by a doctor of the same name. *See* Def.'s Statement of Undisputed Material Facts ("Def.'s Facts") at ¶ 1; Pl.'s Resp. to Def's Statement of Undisputed Material Facts in Supp. of its Mot. for Summ. J. ("Pl.'s Resp.") at ¶ 1. MCMC is an entity that offers independent medical examinations ("IME") for injured claimants. *See* Def.'s Facts at ¶ 3; Pl.'s Resp. at ¶ 3. In 2011, Dr. Mauthe submitted documentation to MCMC seeking to establish a business relationship, through which MCMC would provide IME referrals to Dr. Mauthe. *See* Def. Facts at ¶¶ 5–6; Pl.'s Resp. at ¶¶ 5–6. Dr. Mauthe sent a number of these documents via fax, each of which included a header that provided information about the sender, including the fax number. *See* Def.'s Facts at ¶¶ 7–8; Pl.'s Resp. at

---

[2] The court ordered the parties to engage in any discovery necessary to prepare motions for summary judgment, noting that the court would set a schedule for any additional discovery the parties required, including class discovery, if the summary judgment motions were unsuccessful. *See* Nov. 6, 2018 Amended Scheduling Order at 1, n.1, Doc. No. 30.

¶¶ 7–8. Dr. Mauthe also included his fax number on the resume he submitted to MCMC. *See* Def.'s Facts at ¶ 10; Pl.'s Resp. at ¶ 10.

Following submission of these documents, in February 2011, Dr. Mauthe and MCMC entered into an agreement, under which MCMC would refer patients to Dr. Mauthe, who would then examine and prepare written reports on the patients. *See* Def.'s Facts at ¶ 13; Pl.'s Resp. at ¶ 13. That agreement is still in place today. *See* Def.'s Facts at ¶¶ 14–15; Pl.'s Resp. at ¶¶ 14–15. Dr. Mauthe sent the executed copy of the Independent Medical Examination Services Physician Agreement ("IME Agreement" or "Agreement") to MCMC via fax. *See* Def.'s Facts at ¶ 18; Pl.'s Resp. at ¶ 18. The Agreement obligated Dr. Mauthe to "maintain any and all applicable, pertinent licenses, permits or certifications required by law, including, but not limited to any state licensure, Board Certification and any other professional certification required" to conduct IME's. Def.'s Facts at ¶ 16; Pl.'s Resp. at ¶ 16 (quoting Def.'s Mem. in Supp. of Mot. for Summ. J. ("Def.'s Mem."), Ex. 7, IME Agreement at ¶ 4, Doc. No. 34-11). In Pennsylvania, those licensure requirements include completing 25 credit hours of continuing medical education ("CME") every two years. *See* Def.'s Facts at ¶ 17; Pl.'s Resp. at ¶ 17.

Since entering into this relationship with MCMC, Dr. Mauthe has sent it several documents via fax. In 2012, Dr. Mauthe faxed MCMC his W-9 Form, using the same header that included his fax number. *See* Def.'s Facts at ¶ 19; Pl.'s Resp. at ¶ 19. He did the same in 2015. *See* Def.'s Facts at ¶ 22; Pl.'s Resp. at ¶ 22. Also in 2015, MCMC sent Dr. Mauthe two IME referrals, and Dr. Mauthe's office requested that any documents relating to those referrals be sent via fax. *See* Def.'s Facts at ¶¶ 20, 25; Pl.'s Resp. at ¶¶ 20, 25.

On April 17, 2017, MCMC sent Dr. Mauthe a fax concerning an upcoming CME course in Rosemont, Illinois, hosted by the International Academy of Independent Medical Evaluators

("IAIME"), a not-for-profit organization of medical doctors specializing in IME's. *See* Def.'s Facts at ¶¶ 28–29; Pl.'s Resp. at ¶¶ 28–29. The conference where the course would take place was titled "Foundations of Medicolegal Practice," and the fax stated that it would teach attendees "everything from A to Z about being a medicolegal evaluator and running [an] IME practice." *See* Def.'s Facts at ¶ 32; Pl.'s Resp. at ¶ 32 (quoting Def.'s Mem., Ex. 13, Fax, Doc. No. 34-17). The fax did not include an opt-out notice but did provide IAIME's website and telephone number. *See* Def.'s Facts at ¶¶ 35–36; Pl.'s Resp. at ¶¶ 35–36. Veritas Meeting Solutions, whom IAIME retained to plan the conference, had requested that MCMC send the fax to its physicians in exchange for certain promotional benefits, including a complimentary exhibit table at a conference. *See* Def.'s Facts at ¶¶ 38, 42; Pl.'s Resp. at ¶¶ 38, 42.

According to MCMC's corporate designee, Joseph Lawless, MCMC sent the fax "solely for letting [doctors] know there[ were CME] hours available so that they [could] keep their license and maintain their, you know, good standing." Def.'s Mem., Ex. 1, Deposition of Joseph Lawless ("Lawless Dep.") at 51:19–21, Doc. No. 34-5. The fax recipients included doctors who performed IME's for MCMC over the prior three years and who were still active in MCMC's system. *See* Def.'s Facts at ¶¶ 46–47; Pl.'s Resp. at ¶¶ 46–47. Mr. Lawless, who approved the fax for distribution and worked with MCMC's IT department to identify the fax recipients, testified that he did not know about the TCPA or its opt-out notice requirements when MCMC sent the fax. *See* Def.'s Facts at ¶¶ 61–64; Pl.'s Resp. at ¶¶ 61–64. Upon receiving the fax, Dr. Mauthe had his office manager forward it to his attorney to evaluate a possible TCPA claim. *See* Def.'s Facts at ¶ 51; Pl.'s Resp. at ¶ 51. He did not remember his contractual relationship with MCMC at the time, nor did he know what an opt-out notice was. *See* Def.'s Facts at ¶¶ 49, 52; Pl.'s Resp. at ¶¶ 49, 52.

He has not contacted MCMC or IAIME to request they remove him from their fax lists. *See* Def.'s Facts at ¶¶ 55–56; Pl.'s Resp. at ¶¶ 55–56.

## III.     DISCUSSION

### A.     <u>Standard of Review – Motions for Summary Judgment</u>

A district court "shall grant summary judgment if the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Additionally, "[s]ummary judgment is appropriate when 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Wright v. Corning*, 679 F.3d 101, 103 (3d Cir. 2012) (quoting *Orsatti v. N.J. State Police*, 71 F.3d 480, 482 (3d Cir. 1995)). An issue of fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.* 477 U.S. 242, 248 (1986). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Id.*

The party moving for summary judgment has the initial burden "of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted). Once the moving party has met this burden, the non-moving party must counter with "specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal quotation marks and citation omitted); *see* Fed. R. Civ. P. 56(c) (stating that "[a] party asserting that a fact . . . is genuinely disputed must support the assertion by . . . citing to particular

parts of materials in the record . . .; or . . . [by] showing that the materials cited do not establish the absence . . . of a genuine dispute"). The non-movant must show more than the "mere existence of a scintilla of evidence" for elements on which the non-movant bears the burden of production. *Anderson*, 477 U.S. at 252. Bare assertions, conclusory allegations, or suspicions are insufficient to defeat summary judgment. *See Fireman's Ins. Co. v. DuFresne*, 676 F.2d 965, 969 (3d Cir. 1982) (indicating that a party opposing a motion for summary judgment may not "rely merely upon bare assertions, conclusory allegations or suspicions"); *Ridgewood Bd. of Educ. v. N.E. for M.E.*, 172 F.3d 238, 252 (3d Cir. 1999) (explaining that "speculation and conclusory allegations" do not satisfy non-moving party's duty to "set forth specific facts showing that a genuine issue of material fact exists and that a reasonable factfinder could rule in its favor"). Additionally, the non-moving party "cannot rely on unsupported allegations, but must go beyond pleadings and provide some evidence that would show that there exists a genuine issue for trial." *Jones v. United Parcel Serv.*, 214 F.3d 402, 407 (3d Cir. 2000). Thus, it is not enough to "merely [] restat[e] the allegations" in the complaint; instead, the non-moving party must "point to concrete evidence in the record that supports each and every essential element of his case." *Jones v. Beard*, 145 F. App'x 743, 745–46 (3d Cir. 2005) (citing *Celotex*, 477 U.S. at 322). Moreover, arguments made in briefs "are not evidence and cannot by themselves create a factual dispute sufficient to defeat a summary judgment motion." *Jersey Cent. Power & Light Co. v. Twp. of Lacey*, 772 F.2d 1103, 1109–10 (3d Cir. 1985).

"When considering whether there exist genuine issues of material fact, the court is required to examine the evidence of record in the light most favorable to the party opposing summary judgment, and resolve all reasonable inferences in that party's favor." *Wishkin v. Potter*, 476 F.3d 180, 184 (3d Cir. 2007). The court must decide "not whether . . . the evidence unmistakably favors

one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented." *Anderson*, 477 U.S. at 252. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial'" and the court should grant summary judgment in favor of the moving party. *Matsushita Elec. Indus. Co.*, 475 U.S. at 587 (citation omitted). Further, when one party's claims are "blatantly contradicted by the record, so that no reasonable jury could believe it," the court should not take those claims as true for the "purposes of ruling on a Motion for Summary Judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

## B.    Article III Standing

"Article III standing is essential to federal subject matter jurisdiction and is thus a threshold issue that must be addressed before considering issues of prudential standing." *Hartig Drug Co. Inc. v. Senju Pharm. Co. Ltd.*, 836 F.3d 261, 269 (3d Cir. 2016) (internal quotation marks and citation omitted). There are two types of Article III standing challenges: facial attacks and factual attacks. "[A] facial attack contests the sufficiency of the pleadings, whereas a factual attack concerns the actual failure of a [plaintiff's] claims to comport [factually] with the jurisdictional prerequisites." *Constitution Party of Pa. v. Aichele*, 757 F.3d 347, 358 (3d Cir. 2014) (all but first alteration in original) (internal quotation marks and citations omitted). In evaluating a facial attack, "the court must only consider the allegations of the complaint and documents referenced therein and attached thereto, in the light most favorable to the plaintiff." *Gould Elecs. Inc. v. United States*, 220 F.3d 169, 176 (3d Cir. 2000) (citations omitted).

Although MCMC raises the Article III standing issue on a motion for summary judgment, its argument constitutes a facial attack, because it does not dispute Dr. Mauthe's allegation that the fax used his toner and paper and annoyed him. Instead, MCMC argues that, as a matter of law,

a claim that the fax would have been permissible but for the absence of a valid opt-out notice does not establish constitutional standing, regardless of the lost paper and toner or annoyance. *See* Def.'s Mem. at 18 ("Mauthe would have lost the same amount of time, labor, paper, and ink toner even if MCMC fully complied with the TCPA [by including a valid opt-out notice].").

There are three elements a plaintiff must satisfy to demonstrate Article III standing:

First, the plaintiff must have suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical. Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court. Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992) (internal quotation marks, alterations, and citations omitted). Although MCMC's standing argument focuses primarily on traceability, it also argues, "[Dr.] Mauthe has not and cannot meet Article III's injury-in-fact requirement and has no standing to pursue his TCPA claim." Def.'s Mem. at 19. The court will therefore address both elements.[3]

"Congress is well positioned to identify intangible harms that meet minimum Article III requirements, but a plaintiff does not automatically satisfy the injury-in-fact requirement whenever a statute grants a right and purports to authorize a suit to vindicate it." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1543 (2016). A plaintiff establishes that a legislatively-defined intangible harm constitutes a constitutional injury-in-fact where (1) the plaintiff "sues under a statute alleging the very injury the statute is intended to prevent" and (2) "the injury has a close relationship to a harm traditionally providing a basis for a lawsuit in English or American courts." *Susinno v. Work Out World Inc.*, 862 F.3d 346, 351 (3d Cir. 2017) (internal quotation marks, omissions, and alterations

---

[3] MCMC does not argue that Dr. Mauthe cannot satisfy the third element, redressability.

omitted) (quoting *In re Horizon Healthcare Servs. Inc. Data Breach Litig.*, 846 F.3d 625, 639–40 (3d Cir. 2017) ("*Horizon*")). In *Susinno*, the Third Circuit applied the *Horizon* factors in the TCPA context to determine that the plaintiff suffered a concrete injury from a prerecorded call to her cell phone, even though she was not charged for the call. *See id.* at 351. The court determined that the plaintiff satisfied both parts of the *Horizon* test: first, "Congress squarely identified [the alleged] injury [because t]he TCPA addresses itself directly to single prerecorded calls from cell phones, and states that its prohibition acts in the interest of privacy rights," and second, Congress "sought to protect the same interests implicated in the traditional common law cause of action," namely "intrusion upon seclusion." *Id.* at 351, 352 (alterations and citations omitted).

Likewise, here "Congress squarely identified this injury," because the TCPA specifically prohibits "us[ing] any telephone facsimile machine, computer, or other device to send, to a telephone facsimile machine, an unsolicited advertisement, unless" the advertisement meets certain criteria, including a valid opt-out notice. 47 U.S.C. § 227(b)(1)(C). The injury that prohibition is meant to address is "the unauthorized use of fax machines, toner and paper." *Melrose Hotel Co. v. St. Paul Fire and Marine Ins. Co.*, 432 F. Supp. 2d 488, 510 (E.D. Pa. 2006). More broadly, the TCPA aims to mitigate "the nuisance and invasion of privacy" that unsolicited telecommunications cause. *Leyse v. Bank of Am. Nat'l Ass'n*, 804 F.3d 316, 326 (3d Cir. 2015). Here, the complaint alleges that Dr. Mauthe and the putative class members suffered an injury because the unsolicited fax used their fax machines, toner, and paper and "waste[d their] valuable time that would have been spent on something else." Compl. at ¶ 4. Thus, the claims here satisfy the first part of the *Horizon* test.

In assessing whether a TCPA action satisfies the second part of the *Horizon* test, the *Susinno* court cited a Ninth Circuit Court of Appeals holding that "TCPA claims closely relate to

traditional claims for invasions of privacy, intrusion upon seclusion, and nuisance [which] have long been heard by American courts." 862 F.3d at 351 (alteration in original) (internal quotation marks omitted) (quoting *Van Patten v. Vertical Fitness Grp., LLC*, 847 F.3d 1037, 1043 (2017)). Here, like in *Susinno* and *Van Patten*, the complaint's allegations that an unsolicited fax "interrupts the recipient's privacy" and "wastes the recipient's valuable time" are precisely the types of nuisance and intrusion upon seclusion that parallel interests long recognized to be cognizable at common law.[4] Therefore, Dr. Mauthe has satisfied the second factor of the *Horizon* test, and he has adequately alleged a concrete injury.

Next, MCMC argues that Dr. Mauthe cannot satisfy Article III standing's traceability requirement, because his alleged harm—lost use of his fax machine, paper, ink toner and annoyance—would have occurred even if the fax contained an opt-out notice. *See* Def.'s Mem. at 17. MCMC cites *St. Louis Heart Center, Inc. v. Nomax, Inc.*, in which the Eighth Circuit Court of Appeals held the plaintiff lacked standing because "[w]hether or not the faxes contained a proper opt-out notice, their transmission would have used the [the plaintiff's] paper and toner, occupied its phone lines, and invaded its privacy." *Id.* (quoting 899 F.3d 500, 504 (8th Cir. 2018) (alteration added by MCMC)). Dr. Mauthe responds with citations to several district court decisions reaching the opposite conclusion. *See* Pl.'s Resp. in Opp. to Def.'s Mot. for Summ. J. ("Pl.'s Opp. Mem.") at 16, Doc. No. 44.[5]

---

[4] MCMC notes that Dr. Mauthe testified during his deposition that he did not consider the fax to have invaded his privacy. *See* Def.'s Mem. at 22. However, Dr. Mauthe's other testimony makes clear that his annoyance at the fax constitutes an invasion of privacy for legal purposes, even if it does not meet a layman's definition of "privacy." *See infra* p. 24.

[5] Dr. Mauthe cites to *Gorss Motels, Inc. v. Am. Tex-Chem Corp.*, 323 F. Supp. 3d 330 (D. Conn. 2018); *Gorss Motels, Inc. v. AT & T Mobility, LLC.*, 299 F. Supp. 3d 389 (D. Conn. 2018); *Casso's Wellness Store & Gym, L.L.C. v. Spectrum Lab. Prods., Inc.*, Civ. A. No. 17-2161, 2018 WL 733216 (E.D. La. Feb. 6, 2018); *Gorss Motels, Inc. v. A.V.M. Ents., Inc.*, No. 3:17-cv-1078 (VAB), 2018 WL 691713 (D. Conn. Feb. 2, 2018); *Quinones v. Ocwen Loan Servicing, LLC*, 282 F. Supp. 3d 1207 (C.D. Cal. 2017); *Swetlic Chiropractic & Rehab. Ctr., Inc. v. Foot Levelers, Inc.*, 235 F. Supp. 3d 882 (S.D. Ohio 2017) ("*Swetlic*"); and *Davies v. W.W. Grainger, Inc.*, Case No. 13-cv-3546, 2016 WL 6833902 (N.D. Ill. Nov. 21, 2016).

This court's own analysis is more closely aligned with the district court decisions than the Eighth Circuit's decision in *St. Louis Heart Center*. MCMC cites to *Lujan* for the proposition that "there must be a causal connection between the injury and the conduct complained of—the injury has to be fairly . . . traceable to the challenged action of the defendant." Def.'s Mem. at 16 (quoting *Lujan*, 504 U.S. at 560). However, MCMC omits the last clause of that sentence: "and not . . . th[e] result [of] the independent action of some third party not before the court." *Lujan*, 504 U.S. at 560 (alterations in original) (internal quotation marks omitted) (quoting *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26 (1976)). MCMC is not suggesting that Dr. Mauthe's purported harms are more rightly attributed to some third party.[6] Rather, MCMC's position is that the purported harms are attributable to the receipt of the fax itself, because Dr. Mauthe's lost paper and toner and annoyance would have occurred regardless of whether the fax included the legislatively-mandated opt-out notice. Thus, Dr. Mauthe—and presumably any other plaintiff whose fax was TCPA-compliant but for a deficient or missing opt-out notice—would have no standing, and therefore no remedy, to file suit for failure to comply with 47 U.S.C. § 227(b)(1)(C)(iii).

The TCPA does not distinguish in any way between the injuries suffered (or the remedies available) for an unsolicited fax outside of an EBR and an unsolicited fax within an EBR that lacks the necessary opt-out clause. *See generally id.*; *see also Swetlic*, 235 F. Supp. 3d at 889 ("While the statute carved out a narrow exception to the illegality of transmitting unsolicited fax advertisements, the statute makes no differentiation in the harm caused or the penalty assessed

---

[6] The court recognizes that MCMC asserts it sent the fax on behalf of IAIME, *see* Def.'s Mem. at 6–7, and that the TCPA defines "sender" as "the person or entity on whose behalf a facsimile unsolicited advertisement is sent or whose goods or services are advertised or promoted in the unsolicited advertisement." 47 C.F.R. § 64.1200(f)(10). However, during a telephone conference with the court, MCMC acknowledged that it was the appropriate defendant here under 47 C.F.R. § 64.1200(a)(4)(vi) ("A facsimile broadcaster will be liable for violations of paragraph (a)(4) of this section, including the inclusion of opt-out notices on unsolicited advertisements, if it demonstrates a high degree of involvement in, or actual notice of, the unlawful activity and fails to take steps to prevent such facsimile transmissions.").

whether a defendant fails to meet the opt-out language required or lacks permission to send the fax."). Instead, the TCPA reflects Congress's intent to balance the utility of parties in an EBR being able to communicate via fax against the risk of one party being unduly burdened with unsolicited faxes. Congress addressed that risk by allowing a business to send unsolicited faxes to established business associates, but only if those faxes meet certain delineated requirements, including a valid opt-out notice. *See Horton v. Sw. Med. Consulting, LLC*, Case No. 17-CV-266-CVE-mjx, 2017 WL 2951922, at \*5 (N.D. Okla. July 10, 2017) (stating that "the majority of courts have rejected th[e] argument" that TCPA plaintiffs lack standing in analogous context where "the plaintiff's injuries would be the same whether the call was dialed by an ATDS [(automated telephone dialing system)] or manually." (citations omitted)); *Fairway Med. Ctr. LLC v. McGowan Enters., Inc.*, Civ. A. No. 16-3782, 2017 WL 1423883, at \*3 (E.D. La. Jan. 25, 2017) ("In failing to provide the necessary opt-out language, Fairway avers Acute Care deprived them of the statutorily-mandated remedy to prevent the ongoing receipt of junk faxes." (citation omitted)). In *Horton*, the court reasoned that the "[d]efendants' causation argument and the analogous ATDS argument require an unjustified narrowing of what constitutes a defendant's 'conduct' and impose a heightened causation requirement that is not supported by case law on standing." 2017 WL 2951922, at \*5.

As Dr. Mauthe articulated during his deposition, the harm the challenged fax imposed upon him was "an annoyance and junk that [he] d[id]n't need in the course of [his] day." Def.'s Mem., Ex. 6, Deposition of Dr. Robert Mauthe ("Mauthe Dep.") at 41:16–18, Doc. No. 34-10. MCMC argues Dr. Mauthe would have been just as annoyed had the fax contained a valid opt-out notice. *See* Def.'s Mem. at 18 ("And Mauthe still would have received a document that was not a medical record and found it annoying. These alleged injuries were caused, if at all, by the receipt of the fax

at issue, and not by the lack of an opt-out provision." (citations omitted)). But the court disagrees. The TCPA requires a valid opt-out notice on faxes sent in connection with an EBR because Congress "determined it was necessary to provide recipients with the ability to stop future unwanted faxes sent pursuant to such relationships." S. Rep. No. 109-76 at 7. That requirement reflects that a consumer very likely will be less annoyed—and have his privacy less intruded upon—by an unsolicited fax if he knows there is "a cost-free mechanism" to ensure he will not receive additional faxes in the future. *See id.*; *see also id.* at 9 ("S. 714 would increase the personal privacy of all users of fax machines by providing them with the ability to decline to receive future unsolicited commercial faxes from the same sender."). A single fax with an explicit option to avoid all future communications certainly "intrudes upon the seclusion" of an individual less than a fax that, on its face, appears to be the first of a potential stream of unsolicited advertisements to come, without any mechanism to stop the annoyance. And if anything, MCMC's point that Dr. Mauthe did not know to check for an opt-out provision when he received the fax further supports the necessity of a valid opt-out notice. *See* Def.'s Mem. at 18–19. Without one, Dr. Mauthe, and presumably other fax recipients, would not know how to put a stop to unwelcome communications. Thus, Dr. Mauthe has adequately alleged constitutional standing.

### C. Prudential Standing

The court next evaluates MCMC's claim that Dr. Mauthe lacks prudential standing. *See* Def.'s Mem. at 19 ("As a 'professional plaintiff,' Mauthe lacks prudential standing because he falls outside the TCPA's zone of interests."). MCMC argues that Dr. Mauthe is analogous to the plaintiff who the Western District of Pennsylvania held lacked prudential standing in *Stoops v. Wells Fargo Bank, N.A.*, 197 F. Supp. 3d 782 (2016). In that case, the plaintiff owned more than thirty-five cell phone numbers which she used as part of "a business suing offenders of the TCPA."

197 F. Supp. 3d at 799 (citation omitted). The court held that the plaintiff lacked prudential standing, because she lacked "the sort of interest in privacy, peace, and quiet that Congress intended to protect."[7] *Id*. at 805 (internal quotation marks and citation omitted). Although Dr. Mauthe has filed other TCPA lawsuits, there is no evidence in the record to suggest that he seeks out unsolicited communications the way the *Stoops* plaintiff did. Dr. Mauthe testified that he runs a "small one-physician [medical] practice" where he sees approximately 25 patients a day. Mauthe Dep. at 5:9–11. There is no evidence in the record to suggest that Dr. Mauthe runs his practice to receive unsolicited telecommunications, as the plaintiff did in *Stoops*. To the contrary, Dr. Mauthe testified, "I consider [unsolicited faxes] an annoyance and junk that I don't need in the course of my day . . . It's not about the money. It's just the annoyance of it." *Id*. at 41:16–21. That annoyance places Dr. Mauthe squarely within the zone of interest Congress meant to protect through the TCPA. The fact that Dr. Mauthe has been sufficiently annoyed by other faxes to sue before does not change that result.

### D.      Whether the Fax was Solicited

As discussed above, there is no dispute that the fax did not contain a valid opt-out notice, so the only question is whether it was solicited so that the TCPA does not apply at all. *See* 47 U.S.C. § 227(b)(1)(C) (prohibiting sending unsolicited advertisements via telephone facsimile machine and establishing that EBR only exempts party from liability where certain standards, including valid opt-out notice, are met). Whether a plaintiff expressly consented to receive fax advertisements must be assessed "on a case-by-case basis" and express permission requires "that the consumer understand that by providing a fax number, he or she is agreeing to receive faxed

---

[7] The court also held that the plaintiff did not have constitutional standing, because the calls she received could not have constituted a nuisance or invasion of privacy, as the plaintiff owned the phones for the express purpose of receiving those calls. *See id*. at 800.

advertisements." *CE Design Ltd. v. King Architectural Metals, Inc.*, 637 F.3d 721, 726 (7th Cir. 2011) (internal quotation marks and emphasis omitted) (quoting *In re Rules and Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 18 F.C.C.R. 14014, 14129 (F.C.C. 2003), 2003 WL 21517853). The defendant bears the burden of establishing that the plaintiff provided express permission. *See Daubert v. NRA Group, LLC*, 861 F.3d 382, 390 (3d Cir. 2017) ("As the party claiming Daubert's 'prior express consent' NRA would've been required to prove it at trial." (citation omitted)); *Physicians Healthsource, Inc. v. Cephalon, Inc.*, 340 F. Supp. 3d 445, 452 (E.D. Pa. 2018) ("Accordingly, we further conclude that prior express permission is an affirmative defense on which [defendants] bear the burden of proof."), *appeal docketed*, No. 18-3609 (3rd Cir. Nov. 28, 2018). Here, MCMC argues that Dr. Mauthe consented to receive the fax by entering into the IME Agreement, providing MCMC his fax number several times in connection with that agreement, and regularly communicating with MCMC via fax throughout the parties' relationship. *See* Def.'s Mem. at 12. Dr. Mauthe responds that MCMC's argument depends on the idea that it inferred consent for the fax, but the TCPA requires that permission must be express. *See* Pl.'s Opp. Mem. at 9.

A fax is solicited under the TCPA if the recipient provided "prior express invitation or permission, in writing or otherwise" to receive it. 47 U.S.C. § 227(a)(5). A recipient can provide express consent by providing the sender a contact number, but only for communications "relate[d] to the reason why [he] provided [his] … number in the first place." *KHS Corp. v. Singer Fin. Corp.*, Civ. A. No. 16-55, 2018 WL 4030699, at *4 (E.D. Pa. Aug. 23, 2018) (first and last alteration in original) (internal quotation marks omitted) (quoting *Fober v. Mgmt. & Tech. Consultants, LLC*, 886 F.3d 789, 793 (9th Cir. 2018) and citing *Daubert*, 861 F.3d at 390 and *Blow v. Bijora, Inc.*, 855 F.3d 793, 804 (7th Cir. 2017)). In cases, such as this, where the plaintiff

provided his fax number to the defendant, the "court will have to analyze whether any fax sent to that recipient relates to the reason the contact info was provided in the first place, because if it does, then express consent was provided for the fax, and it cannot be an 'unsolicited advertisement.'" *Id*.

In *Physicians Healthsource*, Judge Padova held that the plaintiff doctor had expressly consented to receive fax advertisements from the defendant where he provided his business card to its representatives following discussions about its products. *See* 340 F. Supp. 3d at 452. MCMC discusses this case, *see* Reply Brief in Further Support of MCMC, LLC's Motion for Summary Judgment ("Def.'s Reply") at 3, but ignores the critical distinctions that separate it from the facts here. In that case, the doctor testified during his deposition that the plaintiff, his employer, "encouraged its doctors to meet with drug company representatives to *obtain information about the drug companies' products*." *Id*. at 452–53 (emphasis added) (internal quotation marks omitted) (quoting deposition testimony). Following discussions between the doctor and the defendant's representatives about those products, the representatives "left product information with [him] and also obtained his permission to follow up by sending him additional information." *Id*. at 453 (citing deposition testimony). The defendant obtained the fax numbers from business cards the plaintiff left on its receptionist's desk, which it did, in part, so that "drug company representatives could use that number to contact" its doctors. *Id*. (citing deposition testimony). Judge Padova concluded that the doctor had consented to receive the challenged faxes, which advertised a dinner meeting program to discuss a drug and a luncheon program to discuss breakthrough pain for opioid-tolerant cancer patients, by discussing both that drug (of which the defendant had sent him samples) and the topic of "narcotic drugs for chronic pain" with the defendant's representatives. *See id*. (internal quotation marks omitted) (quoting deposition testimony).

The United States District Court for the District of New Jersey reached a similar conclusion in a case involving somewhat different facts in *Bailey v. CVS Pharmacy, Inc.*, Civ. A. No. 17-11482(PGS)(LHG), 2018 WL 3866701 (Aug. 14, 2018). *Bailey* considered the defendant's "CVS Ready Text Program," which allowed customers to enroll to receive text messages when their prescriptions were ready for pickup. *Id.* at *1 (citing complaint). The plaintiff challenged that the text's inclusion of the words "Flu shots available" fell outside of the scope of the express permission she had provided to receive text messages from CVS. *Id.* at *7. The District of New Jersey disagreed, holding that the plaintiff construed the scope of consent too narrowly. *See id.* The court quoted the Eastern District of California for the premise that the "TCPA does not require that a call be made for the exact purpose for which the number was provided, but it undoubtedly requires that the call bear some relation to the product or service for which the number was provided." *Id.* (quoting *Olney v. Job.com., Inc.*, No. 1:12-cv-1724-LJO-SKO, 2014 WL 1747674, at *7 (E.D. Cal. May 1, 2014)). The call or message must "closely relate[] to the circumstances under which plaintiff provided his cell phone number," which the CVS text message did because "it notified Plaintiffs of the availability of prescription services." *Id.* (quoting *Aderhold v. Car2go N.A., LLC*, No. C13-489RAJ, 2014 WL 794802, at *5–8 (W.D. Wash. Feb. 27, 2014)).

Although MCMC cites to cases in which courts have held the plaintiffs expressly consented to the communication by providing their fax numbers, *see* Def.'s Mem. at 13–14; Def.'s Reply at 3–4, those cases involved communications that were more closely related to the reason the plaintiffs had provided their contact information. For instance, in *Practice Management Support Services, Inc. v. Appeal Solutions, Inc.*, the Northern District of Illinois held that the plaintiff had provided express permission by submitting its fax number on a website "use[d] to provide information to prospective customers" on a form "used to collect information from persons and

businesses interested in the products and services offered by" the defendant. No. 09 C 1937, 2010 WL 748170, at *1 (Mar. 1, 2010). Even more blatant, in *Landsman & Funk, P.C. v. Lorman Business Center, Inc.*, the form on which the plaintiff's representative provided its fax number "clearly explained that []PROVIDING YOUR FAX NUMBER CONSTITUTES AN EXPRESS INVITATION TO SEND YOU FAX ADVERTISEMENTS ABOUT FUTURE LORMAN SEMINARS.'" No. 08-cv-481-bbc, 2009 WL 602019, at *1–2 (W.D. Wis. Mar. 9, 2009) (citation omitted).

Likewise, in *Gorss Motels, Inc. v. Safemark Systems., LP*, the Middle District of Florida held the plaintiff hotel operators had granted express permission for the challenged faxes by signing franchise agreements that stated that the hotel group and its affiliates, of which defendant was one, "may offer optional assistance to you with purchasing items used at or in the Facility." Case No. 6:16-cv-1638-Orl-31DCI, 2018 WL 5996963, at *2 (Nov. 15, 2018) (quoting agreement), *appeal docketed*, No. 18-15232 (11th Cir. Dec. 17, 2018). Thus, the operators "agreed that [they] could be contacted by [hotel group] affiliates in regard to purchasing items for [their] hotel[s]." *Id.* Similarly, in *Travel 100 Grp., Inc. v. Mediterranean Shipping Co. (USA) Inc.*, the Appellate Court of Illinois held that the plaintiff had granted express permission for the challenged faxes where the cover letter to the questionnaire the plaintiff's representative completed stated that providing its contact information would "assure[] that suppliers will direct relevant promotions and FAM [familiarization] trip information to our participants." 889 N.E.2d 781, 785 (2008) (second alteration in original) (quoting questionnaire cover letter).

Here, there is no dispute that Dr. Mauthe voluntarily provided his fax number to MCMC. The question is whether the fax at issue was closely related enough to the reason he provided the number, *i.e..*, the IME Agreement, to render the fax solicited. MCMC argues that the fax "was part

and parcel of the IME Agreement between Mauthe and MCMC in which Mauthe specifically agreed to perform 'independent medical examinations of individuals referred . . . by MCMC' and 'maintain any and all applicable, pertinent licenses, permits or certifications required by law.'" Def.'s Mem. at 15–16 (alteration added by MCMC) (quoting IME Agreement). Those certification requirements included obtaining 25 CME credits every two years. *See id.* at 16 (citing 49 Pa. Code § 16.19(a)). Unfortunately for MCMC, that connection is too tangential to warrant a ruling in its favor, at least at the summary judgment stage.

In all the cases discussed above, the plaintiffs specifically permitted the defendants to send them *advertising* materials. *See Gorss Motels, Inc.*, 2018 WL 5996963, at *2 (holding that parties' agreement established express permission by stating that hotel group and its affiliates "may offer optional assistance to you with purchasing items"); *Physicians Healthsource, Inc.*, 340 F. Supp. 3d at 452–53 (holding that doctor expressly permitted fax by providing fax number in context of discussions about defendant's products); *Practice Mgmt. Support Servs.*, 2010 WL 748170, at *1, 3 (holding that express permission existed where plaintiff provided contact information on form for potential customers interested in defendant's products and services); *Landsman & Funk, P.C.*, 2009 WL 602019, at *1–2 (holding that plaintiff provided express permission by completing form that explicitly described itself as "an express invitation to send you fax advertisements."); *Travel 100 Group, Inv.*, 889 N.E. 2d at 789 (concluding that questionnaire cover letter established express permission by stating that "suppliers will direct relevant promotions . . . to our participants"). The only exception was *Bailey*, and in that case, the defendant had sent the exact message the plaintiff had requested: a confirmation that her prescription was ready for pickup. *See Bailey*, 2018 WL 3866701, at *2. The mere fact that the text also included the three words "flu shots available" did

not change the fact that the plaintiff had explicitly asked for—and received—a text about the status of her prescription. *See id.*

In contrast, the IME Agreement here established that MCMC would provide IME referrals to Dr. Mauthe, who in turn would complete the requested evaluations. *See* Def.'s Mem. at 3 (citing IME Agreement). The Agreement mandated that Dr. Mauthe remain certified, but it did not mandate that he use MCMC or its partners to meet that requirement. It certainly did not specify that Dr. Mauthe should expect to receive advertising from MCMC, and there is nothing else in the record from which the court could conclude that Dr. Mauthe understood he was consenting to receive advertisements by entering the IME Agreement. *See CE Design Ltd.*, Thus, contrary to MCMC's assertions, Dr. Mauthe's alleged harm—annoyance and the unwelcome interruption of his day—is precisely the sort of privacy interest the TCPA seeks to protect. The fact that Dr. Mauthe, as a non-lawyer, did not recognize this intrusion as what legally amounts to a privacy interest does not change this result. It follows that the TCPA's opt-out notice requirement "directly advance[s]" Dr. Mauthe's privacy interest, and MCMC's argument that the requirement, as applied to him, does not satisfy the *Central Hudson* standard, fails. *See* Def.'s Mem. at 21–25 (discussing *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557 (1980)). MCMC points to the fact that it communicated with Dr. Mauthe for years via fax, but it does not suggest that any of those fax communications related to advertising or to the possibility of Dr. Mauthe potentially purchasing goods or services from MCMC or its partners. Thus, the court cannot conclude that, as a matter of law, the IME Agreement or the communications in connection with that agreement "closely relate[]" to the subject fax for purposes of establishing express permission. *See Bailey*, 2018 WL 3866701, at * 7 (quoting *Olney*, 2014 WL 1747674, at *7).

Of course, MCMC is free to argue to a jury that all these circumstances, taken together, demonstrate that Dr. Mauthe's express consent was sufficiently connected to the subject of the fax to escape TCPA liability. The court simply cannot hold at this stage that no reasonable jury could reach a different conclusion. *See Jackson v. Pmab, LLC*, Civ. A. No. 16-1705, 2017 WL 4316096, at *4 (D.N.J. Sept. 28, 2017) (denying summary judgment because genuine issue of material fact existed as to whether plaintiff provided express consent); *Chladni v. Univ. of Phoenix, Inc.*, No. 5:15-cv-4453, 2016 WL 6600045, at *1 (E.D. Pa. Nov. 7, 2016) (denying summary judgment because genuine issue of material fact existed around whether defendant contacted plaintiff prior to receiving express consent); *cf. Daubert*, 861 F.3d at 390 ("So to carry his burden as the party seeking summary judgment [plaintiff] needed to show the 'absence of a genuine issue of material fact' on his prior express consent." (emphasis and citations omitted)).

## E.    First Amendment Protections

MCMC argues that a holding that the challenged fax ran afoul of the TCPA would violate its First Amendment right to free speech, because Dr. Mauthe denied during his deposition that the fax invaded his privacy, "the sole congressionally recognized justification for requiring opt-out notices." Def.'s Mem. at 22. Specifically, Dr. Mauthe testified that he considered the fax to be "an annoyance and junk that [he] d[id not] need in the course of [his] day." *Id*. at 24 (quoting Mauthe Dep. at 41:17–18). But MCMC's argument mischaracterizes the privacy interest that underlies the TCPA:

> [T]he case law consistently recognizes that the TCPA was enacted in part to address the privacy invasion created by sending an unsolicited fax. There is no indication that Congress passed the TCPA to allay concerns regarding private material being communicated via fax. Instead, Congress took aim at the *intrusive* nature of unsolicited faxes. Much the same way a telemarketing call invades one's right to be left alone, an unsolicited fax intrudes upon the right to be free from nuisance.

*Melrose Hotel Co.*, 432 F. Supp. 2d at 500–01 (internal citations omitted). Thus, contrary to MCMC's assertions, Dr. Mauthe's alleged harm—annoyance and the unwelcome interruption of his day—is precisely the sort of privacy interest the TCPA seeks to protect. The fact that Dr. Mauthe, as a non-lawyer, did not recognize this intrusion as what legally amounts to a privacy interest does not change this result. It follows that the TCPA's opt-out notice requirement "directly advance[s]" Dr. Mauthe's privacy interest, and MCMC's argument that the requirement, as applied to him, does not satisfy the *Central Hudson* standard, fails. *See* Def.'s Mem. at 21–25 (discussing *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557 (1980)).

Nor does the Fourth Circuit's recent decision in *American Association* require a different result. In that case, the court held unconstitutional the TCPA's exemption for calls related to government-guaranteed debt from the general ban on automated calls placed to cell phones. *See* 2019 WL 1780961, at *1. The court applied strict scrutiny in doing so because the exemption was a content-based speech restriction. *See id.* at *6. MCMC recognizes that the Fourth Circuit's decision is "not directly on point," but nevertheless suggests it supports granting summary judgment here because "it reinforces MCMC's position that because the TCPA regulates speech, there are serious First Amendment implications that require dismissal of TCPA actions that cannot meet constitutional muster [and] . . . recognizes that 'consent generally diminishes any expectation of privacy.'" *See* Notice of Suppl. Authority in Supp. of Def. MCMC, LLC's Mot. for Summ. J. at 1–2 (quoting *Am. Ass'n*, 2019 WL 1780961, at *7).

As to MCMC's first argument, there is no denying that the TCPA has First Amendment implications. But as MCMC acknowledges, those implications do not rise to the level of a First Amendment violation if the *Central Hudson* standard is satisfied. *See* Def.'s Mem. at 22 (arguing that Dr. Mauthe's claim fails under First Amendment because "the *Central Hudson* standard

cannot be met here"). Nothing about *American Association* alters the analysis above concerning the *Central Hudson* standard. Nor is MCMC's second argument availing, because, as discussed extensively above, a genuine issue of material fact exists as to the scope of consent Dr. Mauthe provided. If the jury determines that Dr. Mauthe consented to receive the fax at issue, then MCMC's actions fall outside of the TCPA and it could not succeed on an as-applied constitutional challenge. If the jury determines that Dr. Mauthe did not consent to receive the fax at issue, his consent in a different context would not ameliorate the privacy violation that forms the basis of this action. It is worth noting that that the *American Association* decision underscores this privacy interest by narrowing the types of communications that are exempted from TCPA liability. *See* 2019 WL 1780961, at *8 ("The divergence between the debt-collection exemption and the other two exemptions shows that the debt-collection exemption is incompatible with the privacy interests justifying the ban."). Therefore, holding MCMC liable under the facts at issue here would not violate its First Amendment rights.

### F.   The Availability of Treble Damages

Lastly, MCMC argues that the court should dismiss Dr. Mauthe's claim for treble damages because there is no evidence that it willfully or knowingly violated the TCPA. *See* Def.'s Mem. at 25. Specifically, MCMC points to Mr. Lawless's testimony that he "had no knowledge of the TCPA or its requirements during the relevant time period." *Id.* (citing Lawless Dep. at 105:14–24. Under the TCPA, the court has discretion to impose treble damages if the defendant's violation was "willful[] or knowing[]." *See* 47 U.S.C. § 227(b)(3)(C). Courts disagree about the state of mind necessary to establish a willful or knowing violation. *Compare Sengenberger v. Credit Control Servs., Inc.*, No. 09 C 2796, 2010 WL 1791270, at *6 (N.D. Ill. May 5, 2010) (imposing treble damages because willfulness required "only that an action was intentional" and defendants

did not contest that "any of the nine disputed phone calls were made willfully or knowingly" (citation omitted)), *with Texas v. Am. Blastfax, Inc.*, 164 F. Supp. 2d 892, 899 (W.D. Tex. 2001) (holding treble damages were available because defendants "knew their conduct in fact *did* violate the TCPA").

Although the Third Circuit has not yet addressed the "willful or knowing" requirement, districts courts within the Third Circuit have required more than a mere showing that the transmission of a fax was itself intentional to warrant treble damages. *See KHS Corp.*, 2019 WL 1359262, at *5 ("A defendant commits a willful and knowing violation of the TCPA if he or she sends an unsolicited faxed advertisement that he or she knows to be a violation of the TCPA." (citing *Lary v. Trinity Physician Fin. & Ins. Servs.*, 780 F.3d 1101, 1106–07 (11th Cir. 2015)); *Kline v. United N. Mortg. Bankers Ltd.*, No. 4:18-CV-489, 2018 WL 4404674, at *2 (M.D. Pa. Sept. 17, 2018) (holding that plaintiff adequately alleged willful or knowing violation where complaint alleged that defendant "knew that its conduct violated the TCPA" (internal quotation marks, alterations, and citation omitted)); *Jackson,* 2017 WL 4316096, at *4 (granting summary judgment on treble damages claim because evidence that plaintiff's boyfriend gave her number to creditor without indicating it was not his did not "support even an inference of an intentional violation of the statute"); *Zelma v. Art Conway*, Civ. A. No. 2:12-CV-256 (DMC)(DMC), 2013 WL 6498548, at *3 (D.N.J. Dec. 11, 2013) (dismissing treble damages claim because "Plaintiff ha[d] not provided any plausible tactual allegation in his Amended Complaint to demonstrate that any of the Defendants acted 'willfully and knowingly,' as required for treble damages" (citation omitted)); *Md. Cas. Co. v. Express Prods., Inc.*, Civ. A. Nos. 09-857, 08-2909, 2011 WL 4402275, at *13 (E.D. Pa. Sept. 22, 2011) ("The Complaint makes statements that, if the court finds

Defendant's acts to be willful, then treble damages could be awarded, and even if Defendant is negligent, he still violated the TCPA.").

As the Eleventh Circuit explained in *Lary*, "[i]f we interpreted the statute to require only that the violator knew he was making a call or sending a fax, the statute would have almost no room for violations that are *not* willful or knowing." 780 F.3d at 1107 (internal quotation marks, alterations and citation omitted). Two Pennsylvania district courts have since relied on *Lary* to come to the same conclusion. *See KHS Corp.*, 2019 WL 1359262 at *5 (applying *Lary* to hold treble damages were inappropriate where defendant believed it had received plaintiff's permission to send challenged fax); *Manuel v. NRA Group, LLC*, 200 F. Supp. 3d 495, 502 (M.D. Pa. Aug. 5, 2016) ("Neither the Act nor FCC guidance defines these terms [willfully and knowingly]. Courts have generally resolved this ambiguity by requiring evidence of volitional conduct for each element of liability, irrespective of any intent to transgress the Act's prohibitions." (citations omitted)). This court also agrees with *Lary*'s logic: if mere knowledge of the fax's transmission rendered a violation knowing or willful, treble damages would be available in nearly every TCPA cases, not just those where the defendant acted particularly egregiously.

However, that is not to say that ignorance of the law, standing by itself, insulates a defendant from the threat of treble damages. MCMC argues that it is entitled to summary judgment on the treble damages issue because Mr. Lawless, who approved the fax transmission, testified during his deposition that he did not know about the TCPA. *See* Def.'s Mem. at 25. But that testimony only suggests that MCMC could not have known that the fax violated the TCPA, not that it could not have known the fax was unsolicited. Although a violation was clearly knowing and willful if the defendant knew its conduct violated the TCPA when it sent the fax, that does not mean that knowledge of the law is required. Instead, the court has discretion to award treble

damages where the defendant knowingly committed the offense the TCPA prohibits, *i.e.*, sending a fax without consent. *See Lary*, 780 F.3d at 1107 ("The requirement of willful or knowing conduct requires the violator to know he was performing the conduct that violates the statute." (internal quotation marks, alterations, and citation omitted)); *Kline*, 2018 WL 4404674, at *2 (holding that plaintiff adequately alleged willful or knowing violation where complaint alleged that defendant "knew that it did not have [Plaintiff's] prior express consent to make the May 19, 2017 call" (internal quotation marks, alterations, and citation omitted)); *Hawk Valley, Inc. v. Taylor*, No. 10-CV-804, 2012 WL 1079965, at *6 (E.D. Pa. Mar. 30, 2012) (holding treble damages may be available because defendants sent faxes "to recipients whom defendants knew had neither sought nor given permission to receive advertisements by fax").

Presumably to address these holdings, Dr. Mauthe argues that "MCMC knew it was engaging in the conduct forming the basis for this TCPA action—*i.e.*, it knew it was sending a fax message promoting the commercial quality or availability of the IAIME seminar[, *i.e.*, an advertisement]." Pl.'s Opp. Mem. at 26. But the TCPA does not prohibit all fax advertisements; it only prohibits *unsolicited* fax advertisements. Even if a plaintiff did not, in fact, consent to receive the challenged fax, if the defendant *believed* the plaintiff had provided consent, it would not intentionally have engaged in the prohibited act. Here, MCMC has argued that Dr. Mauthe consented to receive fax advertisements such as the one advertising the CME course. *See* Def.'s Mem. at 1–2. Even if the jury determines that Dr. Mauthe did not consent to receive this sort of fax, it could also find that MCMC, albeit mistakenly, believed it had consent to send the fax in light of the parties' relationship. Under those circumstances, MCMC would be liable under the TCPA, but treble damages would be inappropriate. Ultimately, that is an issue for the jury to decide at trial, not the court to resolve at the summary judgment stage. *See Manuel v. NRA Grp. LLC*, 722

F. App'x 141, 144 n.4 (3d Cir. 2018) ("After a two-day trial on treble damages, a jury found that NRA did not willfully or knowingly violate the TCPA."); *Watkins v. Wells Fargo Bank, N.A.*, Civ. No. 15-5712, 2017 WL 2399086, at *7 (D.N.J. June 2, 2017) ("[A]s there are questions of fact regarding both consent and revocation of consent which must be resolved by the jury, the Court denies summary judgment as to Plaintiff's request for treble damages without prejudice to renewing the argument at trial, as appropriate."); *Morse v. Allied Interstate, LLC*, 65 F. Supp. 3d 407, 413 (M.D. Pa. 2014) ("A determination on treble damages is left for a jury.").

## IV.    CONCLUSION

MCMC has undoubtedly provided undisputed evidence that Dr. Mauthe provided his express permission to receive fax communications concerning the parties' IME Agreement. What is less clear is whether that permission was broad enough to cover the fax at issue here. The fact that the IME Agreement required Dr. Mauthe to maintain his medical certification, which in turn required him to earn CME credits, is certainly evidence that the subject of the fax was related to the parties' agreement, but that relationship is not direct enough to warrant a holding that the provided consent extends to the fax as a matter of law. Therefore, the court will deny MCMC's motion for summary judgment.

The court will enter a separate order.


BY THE COURT:


/s/ *Edward G. Smith*
EDWARD G. SMITH, J.